17-4039(L)
USA v. Campo Flores

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2018

(Argued: January 24, 2019      Decided: December 20, 2019)

Docket Nos. 17-4039(L), 17-4141(Con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

EFRAIN ANTONIO CAMPO FLORES and FRANQUI FRANCISCO FLORES DE FREITAS,

*Defendants-Appellants.*[*]

_____

Before: KEARSE, JACOBS, and SACK, *Circuit Judges.*

Appeals from judgments of the United States District Court for the

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

Southern District of New York, Paul A. Crotty, *Judge*, convicting defendants of conspiracy to import cocaine into the United States, in violation of 21 U.S.C. §§ 963, 959(c), 960(b)(1)(B)(ii), and sentencing each principally to 216 months' imprisonment plus a $50,000 fine. On appeal, defendants principally contend (a) that the trial evidence was insufficient to establish their knowledge that the cocaine was to be imported into the United States, and that the court erred by instructing the jury that that element could be satisfied on the basis of conscious avoidance; (b) that the government failed to meet its burden with regard to their defense of entrapment; and (c) that the court abused its discretion in various evidentiary rulings, including the admission of lay opinion testimony identifying a substance as cocaine, the admission of government agents' interpretations of certain statements made by defendants, and the admission, on direct examination, of a government agent's written notes and reports as his prior consistent statements as to defendants' postarrest statements. Defendants also challenge their sentences, principally contending that enhancement under Guidelines § 2D1.1(b)(3)(A), applicable when private aircraft "was used" to import drugs, was error given that their conspiracy was thwarted prior to the transport of any narcotics. Finding no basis for reversal, we affirm the judgments.

Affirmed.

EMIL J. BOVE III, Assistant United States Attorney, New York, New York (Geoffrey S. Berman, United States Attorney for the Southern District of New York, Brendan F. Quigley, Won S. Shin, Assistant United States Attorneys, New York, New York, on the brief), *for Appellee*.

RANDALL W. JACKSON, New York, New York (John T. Zach, Boies Schiller Flexner, New York, New York, on the brief), *for Defendant-Appellant Efrain Antonio Campo Flores*.

MICHAEL A. LEVY, New York, New York (David M. Rody, Michael D. Mann, Elizabeth A. Espinosa, Melanie Berdecia, Sidley Austin, New York, New York, on the brief), *for Defendant-Appellant Franqui Francisco Flores de Freitas*.

KEARSE, *Circuit Judge*:

Defendants Efrain Antonio Campo Flores ("Campo") and Franqui Francisco Flores de Freitas ("Flores") appeal from judgments entered in the United States District Court for the Southern District of New York following a jury trial before Paul A. Crotty, *Judge*, convicting them on one count of conspiracy to import five or more kilograms of cocaine into the United States, *see* 21 U.S.C. §§ 963, 959(c), 960(b)(1)(B)(ii), and sentencing each principally to 216 months' imprisonment and a $50,000 fine. On appeal, defendants contend principally (a) that the trial evidence

was insufficient to establish their knowledge that the cocaine in question was to be imported into the United States, and that the court erred by instructing the jury that that knowledge element could be satisfied on the basis of conscious avoidance; (b) that, with regard to their defense of entrapment, the government failed to meet its burden to prove disposition, and (c) that the court abused its discretion in various evidentiary rulings, including the admission of a lay opinion identifying a substance as cocaine, the admission of government agents' interpretations of certain statements made by defendants, and the admission, during a witness's direct examination, of his written notes and reports as prior consistent statements as to defendants' postarrest statements. Defendants also challenge their sentences, principally contending that an enhancement under Sentencing Guidelines ("Guidelines") § 2D1.1(b)(3)(A), applicable when a private aircraft "was used" to import narcotics, was error given that their conspiracy was thwarted prior to the transport of any drugs. For the reasons that follow, we see no basis for reversal.

# I. BACKGROUND

According to the evidence at the nine-day trial in November 2016, taken in the light most favorable to the government, the events at issue in this prosecution--

4

all of which took place in 2015--had their origin in the efforts of Campo and Flores, nephews of Cilia Flores, the First Lady of Venezuela, to obtain large quantities of cocaine from a Colombian supplier, and then to ship the cocaine from Venezuela to drug traffickers in Honduras. According to Campo, who from an early age was raised by Cilia Flores and sometimes referred to her as his mother, defendants sought to raise $20 million in drug proceeds in order to fund Cilia Flores's 2015 campaign for a position in the Venezuelan National Assembly. The United States Drug Enforcement Administration ("DEA") received word of their efforts and infiltrated defendants' discussions.

A. *The Trial Evidence*

At trial, DEA Special Agent Daniel Mahoney gave general testimony as an expert on "drug trafficking routes, particularly the routes used to move cocaine from South and Latin America, the ways, manor [*sic*], means and method of trafficking along those routes and the prices of cocaine along those routes." (Trial Transcript ("Tr.") at 542-43.) He testified that approximately 90% of the cocaine sent from South America into Central America is destined for the United States, and that it is generally known among traffickers in the region that cocaine sent out of South America and into Central America is headed to the United States.

The government's evidence with respect to Campo and Flores themselves was presented principally through (A) the testimony of DEA Special Agent Sandalio Gonzalez, together with his notes and reports as to defendants' statements following their arrests; (B) the testimony of two witnesses--each a confidential source (or "CS")-- whose identities were protected by the use of the following pseudonyms: "Juan Gomez" ("Gomez"), a DEA confidential source, and "Jose Santos-Pena" ("Santos-Pena"), a former DEA informant; and (C) video and audio recordings of meetings attended by Campo and/or Flores in Venezuela, Honduras, and Haiti, electronic communications between Campo and Santos-Pena, and electronic communications involving one or both of the defendants and other drug traffickers, obtained from cellphones seized from defendants incident to their arrests.

1. *The DEA Learns of Campo and Flores, and Sends in the Spies*

Gonzalez, who coordinated much of the operation that led to defendants' arrests, testified that the DEA's investigation of Campo and Flores began on October 3, 2015, when Gonzalez was contacted by Carlos Amilcar Leva Cabrera, a Honduras-based drug trafficker known as El Sentado (or "Sentado"). Sentado was being prosecuted on federal narcotics charges in the Southern District of New York and had begun providing assistance to the DEA in an effort to obtain a cooperation agreement.

6

Prior to Sentado's contacting Gonzalez, the DEA had not been investigating Campo or Flores and did not know who they were. (*See* Tr. 172.)

Based on what Sentado told Gonzalez, Gonzalez instructed him to record a meeting he was scheduled to have that day in Honduras with Campo and Flores-- using his cellphone, as the DEA would be unable to get unobtrusive recording equipment to him in time. Gonzalez also instructed Sentado to try to contact another DEA cooperating person who was in Honduras, in order to provide a second witness to the meeting with Campo and Flores; but Sentado was not able to get in touch with that person.

Sentado attended the meeting but did not record it. He later sent the DEA a photograph of himself with, *inter alios*, Campo, Flores, and a Honduras-based Colombian drug trafficker, Cesar Orlando Daza Cardona ("Daza"), also known as El Flaco ("Flaco" (or "Flacco")), who had never provided assistance to the DEA. Flaco was the person who had introduced Campo and Flores to Sentado in their quest for cocaine distributors. (*See* Tr. 162-63.)

After hearing from Sentado, Gonzalez enlisted Santos-Pena, a former member of the Sinaloa drug cartel and long-time DEA confidential source, to meet with Campo and Flores in Venezuela posing as a Mexican drug trafficking associate of Sentado. Santos-Pena went to Venezuela in late October, accompanied by his son

7

(who was given the protective pseudonym "Jose Santos-Hernandez" ("Santos-Hernandez")), a CS who also had previously worked with Gonzalez on investigations. Father and son had also jointly provided assistance to other DEA offices, as well as to various local law enforcement departments. For their trip to Venezuela they were equipped with covert recording devices to document their meetings with Campo and Flores.

    2. *Conversations Among Campo, Flores, and the DEA Confidential Sources*

        a. *Defendants' October 23, 26, and 27 Meetings With Santos-Pena*

Santos-Pena and Santos-Hernandez met with Campo and Flores on October 23, 26, and 27 and made recordings of their three business meetings, which were given to the DEA. At trial, the government played portions of audio recordings and of video recordings with synched English subtitles, and introduced translations and transcriptions (with "..." denoting a pause, and the court explaining that "UI stand[s] for unintelligible" (Tr. 614-15)). The recordings and Santos-Pena's testimony about these meetings included the following.

In the October 23 meeting, Campo said that defendants had gone to Honduras to meet with Sentado some weeks earlier and had wanted "'to do something as soon as possible'" (Tr. 612 (quoting (Government Exhibit ("GX") 203-T

8

at 4))--which Santos-Pena testified he understood to mean that Campo wanted to "send a delivery of cocaine to Honduras" (Tr. 612)--but Campo complained about difficulties in reaching Sentado because he occasionally "disappeared" (GX 203-T at 5); Campo said "you can't disappear so long in this business" (*id*.). Santos-Pena explained to Campo and Flores that Sentado was "extremely cautious" and said "I'm the person who buys everything from him... and I am the person who is responsible for taking everything to the United States." (GX 203-T at 6.)

Campo explained defendants' need for speed, stating that "my mom is running for the election and I need . . . twenty million dollars," and "we need it by December." (GX 203-T at 11.) Santos-Pena responded that he had available "money right now to put up and hand to you." (*Id*.) Campo said that because of Sentado's failure to attend "meeting[s] over there, *I started to look around elsewhere*" (GX 203-T at 10 (emphasis added)), which Santos-Pena testified he understood to mean that Campo "was doing other drug deals with other people," *i.e.*, other than Sentado and Santos-Pena (Tr. 615).

At that October 23 meeting, part of the discussion concerned how the cocaine would be transported. Santos-Pena explained that portion of the recording as follows:

9

Q.  Sir, do you see where you say, "Do you want [me to send] a car for you or will you send a car?"

A.  Yes, sir.

Q.  What do you mean by "a car" there?

A.  An airplane.

Q.  To do what?

A.  To send the drugs from Venezuela to Honduras.

Q.  And do you see . . . where defendant Campo says, "I told him I may have the possibility of providing the car?"

A.  Yes, sir.

Q.  Who do you understand defendant Campo to be referring to when he uses the word "him" here?

A.  Mr. Sentado.

Q.  Do you see later in that same row where defendant Campo said, "I had some cars and I was working with some people over there from where you guys are from?"

A.  Yes, sir.

Q.  What did you understand defendant Campo to mean when he said he had been working with some people over there from where you guys are from?

A.  He was referring to some Mexicans.

10

Q. And what kind of work did you understand did he say he was doing with them?

A. Drug trafficking.

(Tr. 619-20 (quoting GX 203-T at 25).) A defense objection to the last question and answer was overruled.

As to the proposed airplane, Campo said "'it departs from here as if someone from our family were on the plane.'" (Tr. 626-27 (quoting GX 201-T at 39).) Santos-Pena interpreted this as an assurance that the drug shipment would be one "hundred percent safe," as it would depart on an airplane with an approved flight plan and official permission to fly. (Tr. 627.)

At that October 23 meeting, Campo also said he would ask his supplier for a sample of the cocaine so that Santos-Pena could "'see what it's like.'" (*Id*. at 632 (quoting GX 202-T at 10).)

At the meeting on October 26, the negotiations covered, *inter alia*, the quantity of cocaine for defendants' first planned shipment, the possibility that defendants would buy an airplane for future trafficking, the price to be charged by Sentado for receiving and unloading the cocaine in Honduras, and how soon defendants would be paid. As to quantity, Santos-Pena stated: "[T]he thousand kilos,

11

or two thousand, or three thousand, or five thousand... whatever you'll be sending me, we'll start with those thousand or eight hundred, whatever you can." (GX 206-T at 28.) Campo stated: "Yes, let's get started right away . . . ." (*Id*.)

On the tape Santos-Pena was heard to say "I'll keep putting money into it until it gets to Mexico, and I keep putting money into it to get it over there, and I keep putting money into it to get it in to the Americans, to cross it over, and I'm taking all the risks, but this is the deal, when I do sell, I sell at a high price" (GX 206-T at 22); he explained what certain phrases meant:

> Q. What did you mean when you said you keep putting money into it to get it into the Americans?
>
> A. That I keep investing money to each kilo of cocaine in order to cover more land and get to the U.S.
>
> Q. And what were some of the expenses that you would need--you were referring to here?
>
> A. Transportation and safety.
>
> Q. And . . . right after the word "Americans" do you see where it says "to cross it over"?
>
> A. Yes, sir.
>
> Q. What do you mean by, "cross it over"?
>
> A. To cross the U.S. border.

(Tr. 662-63 (quoting GX 206-T at 22).)

There was also discussion of a range of per-kilogram prices for cocaine in Honduras. (*See* Tr. 658, 661-62.) Santos-Pena and defendants agreed that Santos-Pena would pay them $10 million for the first planned shipment of 800 kilograms, with "50 percent," $5 million, to be paid in advance shortly before the cocaine was to be flown by defendants to Honduras (Tr. 673; *see* GX 208-T at 14).

At the meeting on October 27, Santos-Pena was allowed to "test" a sample of cocaine brought to the meeting by defendants "in order to see the quality." (Tr. 680-81.) The government played portions of the video recording for the jury; and over defendants' standing objection (*see* Part II.A.2. below), Santos-Pena narrated his inspection of the "kilo of cocaine" brought to the meeting by defendants:

Q. Sir, what were you doing with the kilo of cocaine there?

A. I was checking it out to evaluate the quality and to make sure that it was cocaine.

Q. How were you doing that?

A. I took a little bit with my hands. I smelled it to see if it smelled of cocaine. I looked at the color to see what kind of color it had. I rubbed it a little on my hand so that it would release the oils on my hand and see how much oil it would release.

. . . .

Q. Where did you learn to do that test?

A. In Mexico when I worked for the Sinaloa cartel.

. . . .

Q. And based on that what conclusion did you come to?

A. That it was cocaine and it was good quality.

(Tr. 692-93.)

The video also showed hands, identified by Santos-Pena as those of Campo, "putting on latex gloves" before handling the sample, being careful "not to leave his fingerprints on the kilo of cocaine" (Tr. 688-89), because "'one day it arrives on the other side'" (Tr. 691 (quoting GX 210-T at 23)). Santos-Pena testified that they were discussing the scenario that "[t]hat kilo of cocaine that we were opening could go over to the United States and that they might be full of our fingerprints, mine and Mr. Campo's, and that . . . we could be arrested because of that kilo by an agency such as the DEA." (Tr. 691.)

Santos-Pena testified that after his inspection, the kilogram of cocaine was then resealed, with his help, and secured by Campo.

b. *Campo's Ensuing Communications With Santos-Pena*

After Santos-Pena left Venezuela, he had further communications with Campo via text messages. On October 30, after receiving a text from Campo saying

14

he needed money urgently, Santos-Pena agreed to pay defendants in full in advance of the actual cocaine shipment; and he agreed to pay them $11 million instead of $10 million--the then-market value of the 800 kilograms in Honduras--with any surplus applied to defendants' future shipments. (*See* Tr. 704-05 (discussing GX 301-T at 11-12).) Santos-Pena and Campo also planned to have a test flight from Venezuela to Honduras in early November so that defendants' pilots could "check the logistics." (Tr. 703.) In a text on November 5 or 6, Campo confirmed to Santos-Pena that the plan to ship 800 kilograms of cocaine was on track:

> Q. Sir, do you see where Defendant Campo said: Well, as I was telling you, we have the chairs and the tables here already packed for 800 people. The ladder is all set and you guys are ready to roll there.
>
> A. Yes, sir.
>
> Q. What do you understand the reference to 800 to mean there?
>
> A. 800 kilos of cocaine.

(Tr. 710 (discussing GX 306-T at 13).)

### c. *Flores's November 6 Meeting With Gomez*

In early November, Gonzalez had DEA confidential source Gomez travel

to San Pedro Sula, Honduras, posing as a representative of Santos-Pena. On November 6, Gomez and Sentado met with Flores (who was accompanied by his bodyguard, Jesfran Josnel Moreno (*see*, *e.g.*, Tr. at 1148-49; GX 68; GX 106; GX 402-T at 2)). Gomez recorded the meeting, and the government introduced transcripts. Gomez testified that, Flores, after hearing that Sundays are generally quieter at the Honduras airport and thus preferable days for handling narcotics shipments, stated that he expected the first shipment to be on Sunday November 15, and that defendants would aim to have the plane land in the late afternoon. (*See* Tr. 1161-64.) Flores stated that the "'plane is coming totally clean'" (*id*. at 1163 (quoting GX 223-T at 6)) from the "'president's hangar'" (Tr. 1159 (quoting GX 222-T at 18)), which Gomez understood to mean that "the plane was coming from Venezuela without any problem with the flight plan and everything was arranged in Venezuela" (Tr. 1163).

d. *Defendants' November 10 Meeting With Santos-Pena*

At the direction of Gonzalez, Santos-Pena arranged to meet Campo and Flores in Port-au-Prince, Haiti on November 10--supposedly to hand them their up-front $11 million, but actually to set up their arrests. On November 10, Santos-Pena met defendants at the airport in Haiti and drove with them to a restaurant at a hotel.

16

During the recorded discussion in the restaurant, defendants confirmed their plan to send the first shipment of drugs from Venezuela to Honduras on November 15.

Santos-Pena testified that when he received a signal from Gonzalez that the arrests were about to be made, he excused himself, telling defendants he was "going to go up to one of the rooms to come down with the $11 million." (Tr. 718.) Campo and Flores were then arrested by Haitian authorities coordinating with DEA agents. Later that day, after a formal DEA request to Haiti for defendants' expulsion, custody of Campo and Flores was transferred to Gonzalez and the DEA. Campo and Flores were then flown to Westchester County in New York.

3. *Defendants' Postarrest In-Flight Statements to Gonzalez*

Gonzalez testified that Campo and Flores, after they had been provided with advice-of-rights forms in Spanish and had acknowledged understanding their rights, made various statements to him during the flight to New York. The interviews had not been recorded electronically. In addition to Gonzalez's testimony as to defendants' statements, the government introduced into evidence Gonzalez's notes and reports of those statements, over defendants' objections (*see* Part II.A.1. below). Gonzalez described the interviews, conducted with each defendant separately, as follows.

17

Shortly after the plane took off, Campo, upon realizing that Gonzalez spoke Spanish, inquired whether he could ask Gonzalez some questions. Gonzalez responded that they could talk after the plane leveled off and Campo had been made aware of his rights; and they did. Gonzalez took Campo to the front of the plane, beyond hearing distance of Flores; Campo asked about the crime for which he had been arrested. Gonzalez testified that when he responded that Campo was charged with conspiring to import narcotics,

> [Campo] asked me what if someone went down the path to commit a crime but then repented before committing the crime.
>
> Q. What did you understand Campo to mean when you [*sic*] asked that question?
>
> MR. JACKSON [Campo's attorney]: Objection.
>
> THE COURT: Overruled.
>
> THE WITNESS: I understood him to be referring to the specific cocaine transaction that he had been arrested to [*sic*] prior to delivering cocaine.
>
> . . . .
>
> Q. How did you respond to the question?
>
> A. I told Mr. Campo that . . . there were recordings of the meetings; that he had traveled to Honduras, he had connected to Venezuela, and he traveled to Haiti.

18

(Tr. 135.) When Campo asked whether Gonzalez had actual recordings of the meetings, Gonzalez responded by displaying on his cellphone an image taken from an undercover video recording of the October 27 meeting in Venezuela attended by Campo, Flores, Santos-Pena, and Santos-Hernandez, which showed Campo wearing plastic gloves and holding a package of a white substance.

Gonzalez, when asked what, if anything, he had said to Campo about the picture, testified as follows:

A. I asked him who was the person in the picture.

Q. How did Campo react when you asked him that question?

A. He hung his head and he said it is me.

Q. Did you ask Campo anything else about the photo . . . ?

A. Yes, I did.

Q. What else did you ask him?

A. I asked him what he was holding in the picture.

Q. How did Campo respond?

A. He said you know what that is.

Q. What did you understand Campo to mean when you said that?

MR. JACKSON: Objection.

THE COURT: Overruled.

. . . .

A. I understood him to be referring to cocaine.

(Tr. 137.)

Gonzalez asked Campo where he had obtained the cocaine. Campo responded that an individual called "El Gocho" had provided him with the package in the photograph. Campo said he had been introduced to El Gocho by a man known as "Hamudi." Campo said that he did not know the actual names of either man but he knew that Hamudi had recently been killed.

Campo said that it was El Gocho, with whom he had met about five times, who was to have provided the 800 kilograms of cocaine for defendants' first planned shipment to Sentado, and that El Gocho said the cocaine was "coming from the FARC"--a reference to the Fuerzas Armadas Revolucionarias de Colombia, "a Colombian paramilitary organization . . . known to be one of the largest producers of cocaine in the world" (*id*. at 149). When Gonzalez asked Campo how he was planning to ship drugs out of Venezuela, Campo stated "he didn't need anybody's help to do it, that he could do it because of who he was and the access that he had at the airport."

(*Id*. at 150.)  Gonzalez then asked Campo why he got involved in this deal, in specific selling cocaine to a Mexican who was going to be distributing the cocaine in the United States.

Q.  How did Campo initially respond to that question?

A.  *Campo initially responded* that *he did not know* the drugs were going *to the United States and that those words never came out of his mouth*.

Q.  Did you reply to that?

A.  Yes, I did.

Q.  What did you say?

A.  I reminded him that there are recordings of his meetings and that *he didn't necessarily have to say it himself but he knew* that the Mexican individual had said that.

Q.  How did Campo respond after you told him that?

A.  He said, *yes, but . . . I didn't emphasize it*.

Q.  Now, a moment ago you referred to the Mexican.

A.  Yes.

Q.  That's somebody that Campo referenced during the interview?

A.  Yes, sir.

Q. Who did you understand him to be talking about when he said that?

A. He was talking about the confidential source, Mr. Santos Pena.

(*Id*. at 152-53 (emphases added).)

After this interview ended, Gonzalez took Campo to the back of the plane and brought Flores to the front. In the course of the ensuing interview, Gonzalez

asked Flores how he had gotten in contact with the people in Honduras, and he said that Hamudi introduced him to a man by the name of El Flacco in Honduras.

Q. Did Flores provide any further identifying information for the man he referred to as El Flacco?

A. Yes.

Q. What else did he say?

A. He said he was Colombian.

Q. Did Flores say anything else about Flacco's role?

A. Yes.

Q. What?

A. He stated that Flacco introduced him to El Sentado and that El Sentado introduced him to the Mexican.

(Tr. 162-63.)

Flores stated he had gotten involved in the deal simply to make money; that "the Mexican" would pay $12,000 per kilogram of cocaine; and that, on the planned 800-kilogram shipment, Flores expected to earn $560,000 for himself. Gonzalez testified:

> Q. And when Flores referred to the Mexican, who did you understand him to be referring to?

> A. To our informant, Mr. Santos Pena.

> Q. Did you ask Flores about the intended destination for the cocaine?

> A. Yes, I did.

> Q. What did you ask him?

> A. I asked Flores if he knew where the cocaine was going.

> Q. How did Flores respond?

> A. Mr. *Flores stated that the Mexican had told him the cocaine was going to Mexico and then to the United States*, and *several cities within the United States*.

(*Id*. at 161 (emphases added).)

Gonzalez also testified that each defendant stated that he was involved in the cocaine enterprise for personal gain. Campo said that friends had warned him

against being robbed, and that, as protection, he had fabricated the story about raising money for the campaign of Cilia Flores.

4. *Other Evidence*

Among the other evidence presented by the government at trial were numerous electronic messages between Campo and Flores or between one of them and other persons, collected from the cellphones seized from defendants incident to their arrests. These included hundreds of messages in August and September of 2015, *i.e.*, prior to any involvement by the DEA. (*See* Part II.B.4. below.)

As to Santos-Pena, the government had brought out, during its direct examinations of Gonzalez and Santos-Pena himself, that Santos-Pena was no longer a DEA informant, having been prosecuted in 2016 for engaging in drug trafficking while he was a DEA informant and for lying to the government. As discussed in Part II.B.1. below, defendants in cross-examination of Santos-Pena elicited that he had also continued his illegal activities by communicating with drug trafficking contacts while he was incarcerated and by lying about it when testifying in court. In light of these revelations, the government on Santos-Pena's redirect examination, in the presence of the jury, terminated his cooperation agreement.

24

5. *The Defense Case*

Neither defendant testified at trial. Their primary defense was to argue that they lacked knowledge that the drugs at issue were destined for the United States; that the only mentions of the United States came from government informants; and that defendants were the victims of United States Government entrapment. (*See* Parts II.B.2.-II.B.4. below.)

B. *The Jury Instructions and the Verdict*

In instructing the jury, the district court, *inter alia*, set out the basic legal elements of the charged conspiracy, explaining that the government was required to establish beyond a reasonable doubt that there existed an agreement to import a controlled substance into the United States, or to distribute a controlled substance "intending and knowing that the controlled substance would be imported into the United States," and that defendants knowingly and intentionally associated with and joined in that charged conspiracy (Tr. 1492). Over defendants' objections, the court also instructed that the element of knowledge that the cocaine in question was to be imported into the United States would be satisfied if the jury found that defendants

25

had consciously avoided knowing that it was to be sent to the United States (*see* Part II.B.3. below).

The jury, after deliberating for less than a full day, found Campo and Flores guilty.

Defendants moved for judgments of acquittal or, alternatively, for a new trial. The court denied those motions in an Opinion and Order dated March 24, 2017, *see United States v. Flores*, S5 15 Cr. 765, 2017 WL 1133430 (S.D.N.Y. Mar. 24, 2017) ("Posttrial Order"). Pursuant to the 2016 version of the Guidelines, the district court sentenced each defendant principally to serve a 216-month term of imprisonment and to pay a $50,000 fine. (*See* Part II.C. below.)

These appeals followed.

## II. DISCUSSION

On appeal, defendants--each adopting the arguments made in the other's brief--contend principally (1) that the district court erred in several evidentiary rulings; (2) that the evidence was insufficient to show (a) that they either knew the drugs in question were to be imported into the United States or deliberately avoided

gaining that knowledge, or (b) that their defense of entrapment was defeated by predisposition; and (3) that the application of a sentencing enhancement for private aircraft "used to" import drugs was inappropriate. For the reasons that follow, we are unpersuaded.

A. *Evidentiary Challenges*

Defendants' principal evidentiary challenges are that the district court erred in allowing Gonzalez's notes and reports as to defendants' postarrest statements to be admitted during his direct examination, in allowing Santos-Pena to opine that the sample substance proffered by Campo was cocaine, and in allowing Gonzalez and Santos-Pena to testify as to how they had interpreted certain of defendants' statements. We review such rulings under an abuse-of-discretion standard. *See, e.g.,* *Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997); *United States v. Caracappa*, 614 F.3d 30, 39 (2d Cir.), *cert. denied*, 562 U.S. 1075 (2010); *United States v. Kaplan*, 490 F.3d 110, 117-18 (2d Cir. 2007) ("*Kaplan*"). A district court abuses its discretion when "its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or if its decision cannot be located within the range of permissible decisions." *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013) ("*Cuti*"), *cert. denied*,

135 S. Ct. 402 (2014).

An evidentiary ruling that is erroneous warrants a new trial only if it affects a party's substantial rights. *See* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ."); *Kaplan*, 490 F.3d at 122. "A district court's erroneous admission of evidence is harmless 'if the appellate court can conclude with fair assurance that the evidence did not substantially influence the jury.'" *United States v. Al-Moayad*, 545 F.3d 139, 164 (2d Cir. 2008) (quoting *United States v. Garcia*, 291 F.3d 127, 143 (2d Cir. 2002)). "We reverse a district court's evidentiary rulings 'only if we find manifest error,' that is not 'harmless.'" *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) ("*Lange*") (quoting *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010), *cert. denied*, 565 U.S. 933 (2011)), *cert. denied*, 137 S. Ct. 685 (2017).

1. *Gonzalez's Interview Notes and Reports*

Defendants' principal evidentiary challenge is to the admission, during Gonzalez's direct examination, of his written notes and reports as prior consistent statements. They argue both (1) that those documents were not proper rebuttal because defendants did not mount an "*express* challenge" to Gonzalez's memory

28

(Flores brief on appeal at 42 (emphasis in original)) and did not claim a "*recent fabrication*" (*id.* at 37 (emphasis in original); *see also id.* at 28 (stating that defendants' argument was instead that Gonzalez "*was motivated* by his desire for an eventual conviction *to fabricate or embellish* the confessions *at the time of the interviews*" (emphases added))); and (2) that the government should not have been allowed to "introduce[] those hearsay documents on *direct* examination . . . before Agent Gonzalez had been subjected to any cross-examination or impeachment" (*id.* at 29 (emphasis in original)). Given the record in this case and the permissible uses of prior consistent statements, we see no abuse of discretion in the court's ruling of admissibility, either as to propriety or as to timing.

Preliminarily, we reject defendants' characterization of the notes and reports as hearsay. The Federal Rules of Evidence provide, in pertinent part, that "[a] statement . . . *is not hearsay* [if] . . . [t]he declarant testifies and is subject to cross-examination about a prior statement," and the statement

> (B) is consistent with the declarant's testimony and is offered:

>> (i) to rebut an express *or implied* charge that the declarant *recently* fabricated it or acted from a *recent* improper influence or motive in so testifying; *or*

29

(ii) to rehabilitate the declarant's credibility as a witness when attacked *on another ground* . . . .

Fed. R. Evid. 801(d)(1)(B) (emphases added). Subpart (B)(ii) was added to Rule 801(d)(1) in 2014; it was accompanied by the observation that, while subpart (B)(i) provided for the "substantive admissibility" of prior consistent statements "that were offered to rebut charges of recent fabrication or improper motive or influence," subpart (B)(i) did not "cover consistent statements that would be probative to rebut a charge of faulty memory." Fed. R. Evid. 801 Advisory Committee Note (2014). The Note explained that

> [t]he intent of the amendment [adding subpart (B)(ii)] is to *extend substantive effect* to consistent statements that rebut other attacks on a witness--such as the charges of inconsistency *or faulty memory*.

*Id*. (emphases added). As "not hearsay," such statements are--subject to the usual prerequisites such as relevance--admissible as proof of the substance of the statement.

The district court ruled that Gonzalez's notes and reports were admissible under Rule 801(d)(1)(B) in light of defendants' opening arguments to the jury. In those opening statements, defendants launched an attack on the government's case based principally on the fact that their in-flight interviews were not recorded, and they pointed out, *inter alia*, that the interviews had been lengthy

30

and had occurred more than a year prior to trial. Thus, Flores's counsel stated "when th[e] agent tells you *what he recalls of those hour-long statements a year later*, you will have only his word for it without any way to verify what he is saying." (Tr. 85 (emphasis added).) Campo's opening likewise suggested that Gonzalez might not be sure about "what was actually said" in the interviews. (*Id*. at 60.) Defendants also suggested that Gonzalez had a motive to fabricate or embellish defendants' statements because the DEA investigation had been "botched" (*id*. at 70) in various ways, with the government learning "literally right before this trial began" that it had to arrest and prosecute Santos-Pena and Santos-Hernandez (*id*. at 58; *see also id*. at 70).

In light of these statements, the government promptly moved under Rule 801(d)(1)(B)(ii) to be allowed--as rebuttal to defense counsel's argument "that . . . as to what was said on the airplane" "Agent Gonzalez's recollection can no longer be trusted" (Tr. 90)--to introduce Gonzalez's contemporaneous notes and DEA reports during his direct testimony. The court granted that motion, and we see no error. Although defendants' opening statement challenges to Gonzalez's memory were brief and were not their main challenges, they were in fact made. Further, regardless of defendants' suggestion that Gonzalez had a motive to fabricate or embellish his descriptions of defendants' statements as of the time of their arrests, their arguments

31

that he also had such a motive based on facts related to Santos-Pena that were discovered "literally right before this trial began" (Tr. 58) literally suggested a motive that was recent. Given this record, we cannot conclude that the trial judge lacked discretion to rule that the admission of Gonzalez's notes and reports would constitute a proper response to defendants' attacks on Gonzalez's credibility and memory.

Finally, as to timing, we reject defendants' contention, as stated to the district court in their motion seeking reconsideration of that ruling, that Rule 801(d)(1)(B)(ii) is applicable only if the declarant's credibility or memory is "challenged *during cross-examination*" (Letter from defendants to Judge Crotty dated November 8, 2016, at 2 (emphasis in original)). The Rule applies to a witness who "*is subject to* cross-examination," Fed. R. Evid. 801(d)(1) (emphasis added), about the prior statement; this language does not restrict admissibility to statements of one who has already been cross-examined. *See*, *e.g.*, *United States v. O'Connor*, 650 F.3d 839, 862-63 (2d Cir. 2011) ("*O'Connor*") (trial judge had discretion to allow introduction of a prior consistent statement even before the declarant had given any testimony, where the defendants "had begun their attacks on the credibility of [the declarant's] expected testimony in their opening statements" and "it was clear" that the declarant would be called to testify and "could be cross-examined by the defense about the

statement"), *cert. denied*, 565 U.S. 1148 (2012).  Here, where the government sought permission to introduce the notes and reports of Gonzalez during his direct testimony, it was clear that he would be subject to cross-examination.

In sum, we find no abuse of discretion in the trial court's ruling as to the propriety or the timing of the admission of Gonzalez's notes and reports as prior consistent statements.

2. *Admission of Santos-Pena's Testimony Identifying Cocaine*

Defendants also contend that the district court erred in allowing Santos-Pena to testify that the substance that Campo brought as a sample to the Venezuela meeting on October 27 was cocaine.  The court allowed Santos-Pena to so testify as a lay witness.  Defendants contend that he so testified as an expert and that the court erred in not holding a *Daubert* hearing, *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), as to the validity of his testing process. We disagree.

The Federal Rules of Evidence authorize the court to permit a witness to testify to admissible evidence in the form of an opinion, either pursuant to Rule 702 as an expert, *i.e.*, one who has "scientific, technical, or other specialized knowledge"

based on his "knowledge, skill, experience, training, or education," Fed. R. Evid. 702(a), or pursuant to Rule 701 as a lay witness. Rule 701 provides that

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. In this Rule, part (a)'s rational-basis requirement "'is the familiar requirement of first-hand knowledge or observation,'" *Kaplan*, 490 F.3d at 118 (quoting *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) ("*Rea*")); part (b)'s helpfulness requirement is "principally 'designed to provide assurance[] against the admission of opinions which would merely tell the jury what result to reach,'" *Kaplan*, 490 F.3d at 118 (quoting *Rea*, 958 F.2d at 1215).

Part (c) of Rule 701 is intended "to prevent a party from conflating expert and lay opinion testimony [and] thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 and Fed. R.

34

Civ. P. 26." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("*Garcia*"). "Lay opinion under Rule 701 must be limited to opinions that 'result[] from a process of reasoning familiar in everyday life.'" *Cuti*, 720 F.3d at 459 (quoting Fed. R. Evid. 701 Advisory Committee Note (2000)); *see also United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) ("*Yannotti*"), *cert. denied*, 556 U.S. 1130 (2009).

With respect to the type of evidence needed for the identification of chemical substances,

> courts have permitted lay witnesses to testify that a substance *appeared* to be a narcotic, so long as a foundation of *familiarity with the substance* is established. . . . *Such testimony is not based on specialized knowledge within the scope of Rule 702, but rather is based upon a layperson's personal knowledge*.

Fed. R. Evid. 701 Advisory Committee Note (2000) (emphases added). Thus,

> neither actual drug exhibits nor reports of chemical analysis are required to support a conviction for possession of a controlled substance. . . . As we noted in *Bryce*, "[l]ay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction."

*United States v. Gaskin*, 364 F.3d 438, 460 (2d Cir. 2004) (quoting *United States v. Bryce*, 208 F.3d 346, 353 (2d Cir. 1999) (other internal quotation marks omitted)), *cert. denied*, 544 U.S. 990 (2005); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 329 n.14 (2009)

35

("we disagree with the dissent's contention . . . that only an analyst's testimony suffices to prove [the] fact that the substance is cocaine" (internal quotation marks omitted)).

As set out in Part I.A.2.a. above, Santos-Pena testified that the sample substance presented by defendants at the meeting in Venezuela on October 27 was cocaine. Prior to trial, defendants had moved *in limine* to preclude any such expert testimony by either Santos-Pena or Santos-Hernandez. The government argued that it instead proposed to offer their testimony as lay opinions. The district court ruled that Santos-Pena would be allowed to identify the substance as cocaine as his lay opinion, given his "established" "familiarity with cocaine" and the fact that at that meeting "he saw, touched, and smelled the substance." (Pretrial Hearing Transcript, November 2, 2016, at 5 (internal quotation marks omitted).) The court stated that the fact that Santos-Pena had not also ingested the substance did not suffice to preclude him from giving his lay opinion that it was cocaine. However, the court excluded any opinion testimony by Santos-Hernandez, in part because he had only viewed the substance and had made no tactile, olfactory, or other examination. (*See id*. at 5-6.)

On appeal, defendants maintain that Santos-Pena testified as an expert because his "testimony that he could determine the identity *and purity* of cocaine by

36

extracting an unknown grease from it was precisely the type of 'technical, or other specialized' knowledge that is the province of Rule 702" (Campo brief on appeal at 45 (emphasis added)), and that because Santos-Pena was not qualified as an expert in accordance with Rule 702, his testimony was improperly admitted. Defendants also argue that because the tests to which Santos-Pena subjected the substance proffered by Campo did not include ingestion, they were insufficient to permit him to reach a rational opinion that it was cocaine because "[w]hen *a drug user* gives *expert* opinion testimony as to the identity of a substance *based on his experience ingesting* the particular substance, the drug user infers the identity of the substance *based on the effects of the substance when ingested*." (Campo brief on appeal at 42 (internal quotation marks omitted) (emphases ours).) We reject both the contention that Santos-Pena testified as an expert and the proposition that he could not properly give his lay opinion that a substance contained cocaine without having ingested it.

Preliminarily, we note that defendants' assumption that Santos-Pena must have testified as an expert because he opined on "purity" (Campo brief on appeal at 45) exaggerates the record. The only reference to a specific degree of purity ("[n]inety-five to ninety-seven") was in Santos-Pena's recorded statement to defendants at the October 27 meeting (GX 213-T at 3-4). At trial, Santos-Pena did not

37

testify that the cocaine sample had any particular degree of purity, other than to say that it was of "good quality" (Tr. 693). Nor was there any need for evidence as to the sample's degree of purity, as it is unlawful to import or conspire to import a substance containing any "detectable amount" of cocaine, 21 U.S.C. § 960(b)(1)(B); *see id*. § 963.

Moreover, the court plainly and properly did not allow Santos-Pena to testify as an expert, nor did he purport to do so. Santos-Pena was not a chemist. He testified that his tests "didn't involve any special instruments" (Tr. 917); nor had he had any training in scientific analysis of chemical substances (*see id*. at 923-24). Indeed, Santos-Pena had no schooling past the fourth grade. (*See id*. at 186.) Rather, he used quick and practical tests for assessing whether a substance contained cocaine. Further, although Santos-Pena was a "drug user" (Campo brief on appeal at 42 (internal quotation marks omitted)), Santos-Pena did not purport to base his opinion on his experience as, or its effect on, a user. Rather, the tests he used--which, though not scientific, were plausible as a practical matter--made it possible for him to make such a determination without any ingestion of the substance.

The other foundations of Santos-Pena's familiarity with cocaine, and of his ability to determine its presence without testing by ingestion, were established by

38

his decade of dealing with cocaine while working for the Sinaloa drug trafficking cartel from 1991 to 2000. (*See* Tr. 681.) Santos-Pena testified that in examining the sample substance handed him by Campo, he conducted the tests he had been taught to use "[i]n Mexico when [he] worked for the Sinaloa cartel." (*Id*. at 693.) They entailed "[s]melling [the cocaine], looking at it, and rubbing it on [his] hand." (*Id*.) Sinaloa cartel personnel used these tests "[b]ecause when we received drug shipments from Colombia" to be sold to drug traffickers in the United States, "[we] had to confirm that it was actually cocaine" (*id*. at 920, 921)--in order to avoid, as defense counsel characterized it and Santos-Pena acknowledged, the "known risk within the drug business" (*id*. at 921).

Santos-Pena testified that in dealing with those shipments from Colombia, to be sure they actually contained cocaine, "what we did is we very quickly opened up one kilo just randomly. We would open it to confirm that it was cocaine. And that was the test, the smell, by sight, by color, and the quality." (*Id*. at 920.) Thus, while there was no indication that Santos-Pena was an educated expert or had had training in any technical aspect of substance identification, the provenance of the tests he used--an established drug cartel's standard practice--provided a rational basis for Santos-Pena's ability to evaluate the substance submitted for his personal

examination. Given that there was no physical substance available for examination by the jury--whose members, in any event, likely did not share Santos-Pena's testing experience--it was well within the district court's discretion to allow Santos-Pena to give his lay opinion that the sample substance proffered by defendants was cocaine, as an opinion that would be helpful to the jury in determining defendants' knowledge and intent to participate in a cocaine trafficking conspiracy.

3. *Testimony Interpreting Defendants' Statements*

Defendants also contend that the district court abused its discretion in allowing Gonzalez and Santos-Pena to provide their interpretations of certain statements made by Campo. Although defendants at trial objected to several requests for such witness interpretations and were granted a standing objection, their appellate briefs target just two Gonzalez interpretations of statements by Campo during his postarrest interview and one Santos-Pena interpretation of a Campo statement in the October 23 meeting. Both Gonzalez and Santos-Pena were so testifying as participants in the conversations and as to what they had understood defendants to mean, *i.e.*, as lay witnesses rather than as experts, and we reject defendants' challenges, given the Rule 701 principles discussed above.

The Gonzalez responses challenged here are (1) after Gonzalez told Campo he had been arrested for conspiracy to import narcotics into the United States, and Gonzalez was asked what he understood Campo to mean in responding "what if someone went down the path to commit a crime but then repented before committing the crime," Gonzalez testified that he understood Campo to be referring to the cocaine undertaking for which he had just been arrested without actually delivering cocaine (Tr. 135); and (2) after Gonzalez asked Campo what the packaged white substance was that he was holding in the picture of himself wearing gloves, and was asked what he understood Campo to mean in responding "you know what that is," Gonzalez testified that he understood Campo to mean cocaine (*id*. at 137). The first of Campo's statements was somewhat opaque; and the second was one that might have had different meanings, depending on the speaker's tone, facial expression, or gestures. But plainly, Gonzalez's interpretations were the product of reasoning processes familiar to the average person, rather than being based on scientific, technical, or other specialized knowledge. And while it seems likely that the jury would have reached the same understandings Gonzalez did as to the meanings of those statements, his interpretations need not have been essential to enable the jury to have a clear understanding so long as they were "helpful," Fed. R.

41

Evid. 701(b). The Rule allows a lay opinion that "affords the jury an insight into an event that was uniquely available to an eyewitness. In this respect, the Rule recognizes the common sense behind the saying that, sometimes, 'you had to be there.'" *Garcia*, 413 F.3d at 212.

The other interpretation to which defendants object here concerned Campo's October 23 statement to Santos-Pena that "'I had some cars and I was working with some people over there from where you guys are from'" (Tr. 619 (quoting GX 203-T at 25)). As we have recognized, "individuals engaging in illicit activities rarely describe their transactions in an open or transparent manner and the government may call witnesses to provide insight into coded language through lay opinion testimony," *Yannotti*, 541 F.3d at 126, and we see no error in allowing such insight in this instance.

Santos-Pena had interpreted "cars" to mean airplanes (Tr. 619 (internal quotation marks omitted)); with respect to the latter part of Campo's statement he interpreted "people" to mean Mexicans; and, over a defense objection, he interpreted "working" to mean drug trafficking (Tr. 620). This was hardly the only instance in which Campo used "work" to refer to drug trafficking. Most obviously, two days after the initial drug transaction negotiation with Sentado, Campo had texted Sentado

42

and said "[w]hat I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work" (GX 3508-38-T at 2 (October 5, 2015 text from Campo to Sentado)). It is entirely possible that the jury would have inferred on its own that Campo's reference to "working" in his conversation with Santos-Pena also meant drug trafficking. Nonetheless, Santos-Pena's understanding as to what Campo meant by "working," *i.e.*, drug trafficking--in their conversation about drug trafficking--was admissible as helpful to the jury in understanding defendants' coded language.

B. *Sufficiency of the Evidence*

Defendants challenge the sufficiency of the evidence at trial to support their convictions, contending principally (1) that we should "disregard" as incredible the testimony of Santos-Pena and just "test the sufficiency of whatever evidence might be left" (Campo brief on appeal at 26); (2) that there was inadequate proof that defendants had any knowledge that the destination of the drugs would be the United States; (3) that there was no evidence that they deliberately avoided gaining such knowledge; and (4) that the government failed to rebut their defense of entrapment. We reject all of these challenges.

43

In mounting a challenge to the sufficiency of the evidence, "defendants face a heavy burden, as the standard of review is exceedingly deferential" to the jury's apparent determinations. *United States v. Baker*, 899 F.3d 123, 129 (2d Cir.) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 577 (2018). It is well established that "the government is entitled to prove its case solely through circumstantial evidence," *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004); and when the offense at issue is conspiracy, "deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court," *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010) (internal quotation marks omitted). On appeal from a judgment of conviction, we "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008). A sufficiency challenge must fail if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

It is also well established that "[i]t is the province of the jury and not of the court to determine whether a witness who may have been inaccurate,

44

contradictory and even untruthful in some respects was nonetheless entirely *credible in the essentials* of his testimony." *O'Connor*, 650 F.3d at 855 (internal quotation marks omitted) (emphasis ours). A jury is entitled to believe part and disbelieve part of the testimony of any given witness. *See, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 150 (2d Cir. 2012); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 325 (2d Cir. 1986), *cert. denied*, 480 U.S. 922 (1987); *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir.) ("when testimonial inconsistencies are revealed on cross-examination, the jury [i]s entitled to weigh the evidence and decide the credibility issues for itself" (internal quotation marks omitted)), *cert. denied*, 558 U.S. 965 (2009).

A defendant's challenge to witnesses' "credibility based on their plea agreements with the government and their long histories of criminal and dishonest behavior" is subject to these standards. *United States v. Florez*, 447 F.3d 145, 156 (2d Cir.) ("*Florez*"), *cert. denied*, 549 U.S. 1040 (2006); *see, e.g., United States v. Riggi*, 541 F.3d 94, 108 (2d Cir. 2008) ("All issues of credibility, including the credibility of a cooperating witness, must be resolved in favor of the jury's verdict."). "We will not attempt to second-guess a jury's credibility determination," and "we will assume that the jury 'resolve[d] all issues of credibility in favor of the prosecution.'" *Florez*, 447 F.3d at 156 (quoting *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

45

1. *The Testimony of Santos-Pena*

Given these principles, we reject the contention that the testimony of Santos-Pena should be entirely disregarded. At trial Campo and Flores extensively explored Santos-Pena's credibility on cross-examination by, *inter alia*, emphasizing that for several years during the time he operated as a DEA confidential informant, he engaged in extensive unauthorized drug trafficking activities; that the government learned of those activities in 2016; and that in September 2016, just two months before defendants' trial, Santos-Pena pleaded guilty to charges of importing drugs into the United States, distributing drugs in the United States, and lying to the government. (*See* Tr. 725-33, 756-57, 879-94; *see also id*. at 602, 684, 719.) Defendants also elicited new evidence that following that guilty plea Santos-Pena had continued his illegal activities by communicating with Santos-Hernandez and other drug traffickers from prison, and had lied under oath about having done so when he testified in the present case. (*See id*. at 951-80.)

However, these were factors for the jury to assess, and the jury was properly instructed that it was "quite free to reject all or any part of [Santos-Pena's] testimony" (Tr. 1482). As Santos-Pena's testimony with respect to his dealings with defendants was not incredible as a matter of law--indeed, most of those dealings had

46

been captured in recordings--we decline defendants' request to disregard it in our assessment of the sufficiency of the evidence.

2. *Knowledge or Belief as to Likely United States Importation*

Title 21 of the United States Code provides, *inter alia*, that it is unlawful for any person (i) "knowingly or intentionally" to "import[] . . . a controlled substance" into the United States, 21 U.S.C. §§ 960, 952 (2015); or (ii) "to manufacture or distribute a controlled substance . . . intending . . . or . . . knowing that such substance . . . will be unlawfully imported into the United States," *id*. § 959(a); or (iii) to "conspire to commit" such offenses, *id*. § 963. "To prove intent, of course, the government must show knowledge, for 'knowledge is the foundation of intent.'" *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711-12 (1943)).

"The crux of a conspiracy is an agreement between two or more persons to join together to accomplish something illegal." *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019). That agreement "may be tacit rather than explicit." *United States v. Zhou*, 428 F.3d 361, 370 (2d Cir. 2005) (internal quotation marks omitted). To establish a conspiracy-to-import offense, the government is required to prove, *inter*

47

*alia*, that the defendant knew or believed that the conspiracy involved narcotics bound for the United States. *See, e.g.*, *United States v. Romero-Padilla*, 583 F.3d 126, 129 (2d Cir. 2009) ("*Romero-Padilla*"), *cert. denied*, 559 U.S. 930 (2010); *United States v. Londono-Villa*, 930 F.2d 994, 998 (2d Cir. 1991) ("*Londono-Villa*"). And "[a]lthough knowledge is, fundamentally, belief substantiated by veracity," "in the context of a sting operation" "belief is tantamount to knowledge." *United States v. Nektalov*, 461 F.3d 309, 316 (2d Cir. 2006).

While it is seldom feasible to present direct evidence of a person's state of mind, it is often possible to infer knowledge or belief from outward manifestations such as a defendant's statements or conduct, or from the circumstances surrounding or attendant upon facts he or she is alleged to have known. *See United States v. O'Brien*, 926 F.3d 57, 79 (2d Cir. 2019); *United States v. Nersesian*, 824 F.2d 1294, 1314 (2d Cir.), *cert. denied*, 484 U.S. 958 (1987). For example, evidence that a defendant was aware that "narcotics transported from Colombia to Mexico typically do not remain in Mexico because their value is considerably higher in the United States" provides some evidence that he knew the cocaine at issue was to be imported into the United States. *Romero-Padilla*, 583 F.3d at 130.

To meet its burden to prove knowledge in this case, the government

sought to show that Campo and Flores either actually knew the cocaine was to be imported into the United States, or (*see* Part II.B.3. below) believed it was and consciously avoided gaining that knowledge. Contrary to defendants' supposed argument that there is "no evidence" that they "understood or agreed to any decision to send narcotics to the United States" (Campo brief on appeal at 21), defendants also state that their "supposed confessions" to Gonzalez in-flight "*were* the only *direct evidence* that the defendants believed that the drugs at issue were bound for the United States" (Flores brief on appeal at 28 (emphases added); *see also id*. at 2 n.1, and Campo brief on appeal at 16 n.3 (each defendant adopting the other's arguments on appeal)). Our review of the record persuades us that that direct evidence of defendants' statements and the additional circumstantial evidence of such knowledge were ample to permit a rational juror to infer that defendants well knew or at least actually believed and agreed that the cocaine they sought to sell to Sentado in Honduras was to be sent on to the United States.

As a general matter, DEA Special Agent Mahoney testified that the approximate price of a kilogram of cocaine was $10,000-$12,000 in Honduras or Guatemala, but $25,000 in the United States. (*See* Tr. 547.) The mere fact that defendants planned to have the cocaine flown to Honduras would not alone have

49

been sufficient to support a finding that these defendants knew the cocaine would be sent to the United States. For example, in *Londono-Villa*, the defendant's role was to guide a pilot from Panama to a certain Colombian airstrip in a roundabout way that the pilot would be unable to duplicate, and to verify that the cargo delivered to the plane in Colombia was cocaine, after which the plane returned to Panama and the defendant remained in Colombia. *See* 930 F.2d at 995-96. We concluded that evidence that Panama is sometimes used as an interim stop for drugs ultimately intended for importation into the United States was not sufficient to show that the defendant had knowledge of the United States as a destination given that he "*was not involved in any of the lengthy negotiations* for the sale of the cocaine," there was "*no evidence that [he] had been told* that the United States was to be the ultimate destination of the cocaine," and there was "*no evidence that the United States was ever mentioned in his presence,*" *id*. at 1001 (emphases added). But in the present case, there was evidence of all these indicia of knowledge that we found meaningfully absent in *Londono-Villa*, including the following.

First, Campo and Flores were participants in all four of the meetings held in October with Sentado or Santos-Pena; indeed, Campo and Flores were principals. Second, although it is not clear whether importation into the United States was

50

discussed at the very first (October 3) meeting, the government introduced into evidence recordings of the other three October meetings and of the November 10 meeting, in which Santos-Pena or Santos-Hernandez met with defendants and made a total of more than a dozen references to the trafficking of drugs into the United States, including the following:

■ At the October 23, 2015 meeting with defendants in Venezuela, Santos-Pena said explicitly that he was "the person who buys everything from" Sentado, "*taking everything to the United States*" (GX 203-T at 6 (emphasis added));

■ at the same meeting, after Campo had described agreeing with Sentado to "do something," Santos-Hernandez (listed as CS-2) said:

CS-2: *You know that we send a lot of that to...*

Campo: Of course.

CS-2: *... to New York . . . .*

(GX 201-T at 5 (emphases added));

■ at the October 26 meeting, Santos-Pena explained he would "keep putting money into it until it gets to Mexico" and "keep putting money into it *to get it in to the Americans*," and *Campo directly responded, "Of course"* (GX 206-T at 22 (emphases added));

■ during that October 26 meeting, Santos-Pena stated that "starting December eighth or twelfth" when "the border gets very harsh surveillance," he would stop shipping cocaine "*into the United States*" (GX 206-T at 33 (emphasis added));

51

■ in Haiti on November 10, after Campo asked Santos-Pena if he did not like working in Europe, Santos-Pena said "*my business is* right there *inside the United States, which is your business as well because you are the owner of that work*"; and when Santos-Pena said "*in New York I sell it for thirty-six*, thirty-nine for each one," *Campo responded simply, "Sure*" (GX 230-T at 8, 6 (emphases added));

■ and at that final meeting, when Santos-Pena (listed as CS-1) said "once you have finished up with your mom's commitments, you tell me, 'You know what? There go one thousand, of the one thousand, only pay me eight hundred,' as an example, 'pay me nine hundred, whatever you want,'" here is how defendants responded:

Campo: Yes, well, we discussed that yesterday...

CS-1: "And one hundred or two hundred..."

Campo: *Put them in for me over there...*

CS-1: "... *sell them for me in New York*."

Campo: *Yes* [U/I].

CS-1: *So that you can see what one hundred kilos implies in New York.*

Flores: *Sure*, [U/I].

(GX 230-T at 8 (emphases added).)

Finally, at Santos-Pena's meeting with Campo and Flores on October 26, Santos-Pena stated, *inter alia*, that the per-kilogram price of cocaine in Honduras fluctuated between $12,000 and $14,000 (*see* GX 206-T at 18), and "if I sell in New

52

York, I sell it for forty-seven thousand" (*id*. at 23). Santos-Pena later agreed to buy defendants' 800 kilograms of cocaine for $11 million; that would cost Santos-Pena $13,750 per kilogram. Even if Santos-Pena had not explicitly told Campo and Flores on October 26, "I sell . . . high," no rational person could infer that Santos-Pena would plan to sell those 800 kilograms in Honduras for a profit of less than 2%--or for a loss--when he has told them he could sell it in the United States for more than three times what he was to pay them for it.

All of this circumstantial evidence easily permitted the jury to find that defendants had the requisite knowledge that the cocaine they planned to have flown to Honduras would ultimately be bound for the United States. Indeed, the recorded statements directly support Gonzalez's testimony that, when he asked Flores whether Flores knew the cocaine was to go to the United States, "Flores stated that the Mexican had told him the cocaine was going to Mexico and then to the United States, and several cities within the United States" (Tr. 161).

3. *Conscious Avoidance*

At the request of the government, and over defendants' objections, the court gave an instruction that the jury could find that the disputed knowledge

53

element of the charged conspiracy was proven if it found that defendants consciously avoided knowing that the cocaine they were to sell to Sentado and Santos-Pena was to be imported into the United States:

> In determining whether the defendants acted knowingly and intentionally regarding the object or purpose of the conspiracy, *you may consider whether the defendants deliberately closed their eyes as to what otherwise would have been obvious. . . .* [O]ne may not willfully and intentionally remain ignorant of a fact that is material and important to one's conduct in order to escape the consequences of the criminal law.

(Tr. 1504 (emphasis added); *see also id*. at 1505 ("if you find that the defendants were aware of a high probability that the conspiracy at issue . . . was to import cocaine into the United States, and the defendants consciously avoided confirming that fact, you may infer that they implicitly had knowledge").)

On appeal, defendants do not challenge the content of the court's conscious-avoidance instruction. (*See* Flores reply brief at 7 n.1.) Rather, they contend (a) that giving any instruction as to that concept was improper because there was no factual predicate for it, arguing that there was no evidence that they "*deliberately avoided* learning--or forming a belief" that the cocaine would be bound for the United States (Flores brief on appeal at 21 (emphasis in original)), and (b) that giving such an instruction "improperly permitted the jury to substitute conscious

54

avoidance for *knowledge of the existence of the conspiracy*" (*id*. at 25-26 (emphasis added)). We reject both contentions.

The latter contention warrants little discussion, as it is squarely refuted by the conscious avoidance instruction as given. The court stated:

> I want to be clear that this concept only applies when determining whether a defendant knew the objects or purposes of the conspiracy; it does not apply when determining whether a defendant knowingly participated in the conspiracy. It is logically impossible for a defendant to join a conspiracy unless he knows that a conspiracy exists. Thus, for example, if you find that the defendants were aware of a high probability that the conspiracy at issue in Count One was to import cocaine into the United States, and the defendants consciously avoided confirming that fact, you may infer that they implicitly had knowledge; *if, however, the defendants actually believed that the conspiracy was not to import cocaine into the United States, or if the defendants were merely negligent or careless with regard to the knowledge they had, they lacked the knowledge necessary to become a coconspirator.*

(Tr. 1504-05 (emphasis added).)

As to defendants' contention that there was insufficient evidence to indicate that they deliberately avoided knowing that the cocaine was to be sold in the United States, the district court expressly recognized the principle that a conscious avoidance charge is not warranted in the absence of such evidence:

> "[a] conscious avoidance instruction may only be given if (1) the defendant asserts the lack of some specific aspect of knowledge

55

required for conviction, and (2) the appropriate factual predicate for the charge exists . . . ." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (internal quotation marks and alteration omitted). The second prong of the test "has two components-- there must be evidence that the defendant (1) was aware of a high probability of the disputed fact and (2) deliberately avoided confirming that fact." *Id*. "A factual predicate may be established where a defendant's involvement in the criminal offense may have been so overwhelmingly suspicious that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *United States v. Lange*, 834 F.3d 58, 78 (2d Cir. 2016) (internal quotation marks and alteration omitted).

Posttrial Order, 2017 WL 1133430, at *6.

As discussed above, although it is rare to have direct evidence of a person's state of mind, it may be possible to infer a person's knowledge, belief, or intent from, for example, his or her statements or conduct, or from the circumstances. Here, the district court (referring to Campo as "Campo Flores") aptly pointed to all of these sources in rejecting defendants' contention that there was no evidence that they had deliberately avoided knowing or believing that their cocaine was bound for the United States:

The government presented evidence that Defendants made a tactical decision not to confirm that the cocaine was bound for the United States. *There are at least 13 recorded instances where the CSes made statements about taking drugs to the United States.* Yet in all of those instances, Defendants never really respond to the

CSes' statements. Campo Flores appears to have provided the explanation for why. In his confession, Campo Flores initially took the position "that he did not know the drugs were going to the United States and that those words never came out of his mouth." Tr. 152. However, *after DEA Special Agent Sandalio Gonzalez explained to Campo Flores that "there are recordings of his meetings and that [Campo Flores] didn't necessarily have to say it himself but knew that the Mexican individual had said that," Campo Flores responded "yes, but I didn't emphasize it."* Tr. 153. This is strong evidence that, in order to maintain deniability, Defendants made a conscious attempt to avoid confirming that the target of the conspiracy was the United States.

Posttrial Order, 2017 WL 1133430, at *7 (emphases ours). The court added that

in fact, because Defendants did not respond to the CSes' repeated references to the United States, the defense was able to use as a theme throughout the trial that Defendants did not know the target of the conspiracy was the United States.

*Id*. For example, in summation defense counsel emphasized that defendants themselves had made "[z]ero" "references to importation . . . into the United States" and that they "basically never respond[ed]" to the dozens of such references made by the CSes. (Tr. 1360-62.) As the district court observed, a "'purposeful contrivance to avoid guilty knowledge'" may be inferred from the fact that defendants declined to mention the ultimate destination for the cocaine "after the CSes' myriad references to taking drugs to the United States," Posttrial Order, 2017 WL 1133430, at *7 (quoting *Lange*, 834 F.3d at 78).

57

In addition, we note recorded conversations in which defendants, in discussing other drugs, explicitly showed keen interest in the fact that those drugs fetched higher prices in the United States than elsewhere. For example, on October 27, Campo referred to "tusi" (Tr. 694)--apparently another Colombian drug (*see* GX 213-T at 9)--a kilogram of which Campo said "on the market costs" "Fifty thousand dollars. *Here*!" (GX 213-T at 7 (emphasis added)). Campo asked, "don't you guys sell *tusi* . . . over there?" (GX 213-T at 6 (italics in exhibit)); Santos-Pena testified that "over there" referred to the United States (Tr. 694 (internal quotation marks omitted)), and that "[Campo] was asking me about whether I could send [tusi] to the U.S." (*id.*):

> Campo: . . . one kilo of sweets costs fifty thousand dollars, one kilo.

> CS-1 [Santos-Pena]: They are sending those to Europe more, right?

> Flores: Yes... they are also *in the United States*.

> Campo: Yes, but *in the United States* it costs two hundred thousand dollars per kilo [U/I].

(GX 213-T at 10 (emphases added).)

From defendants' vague or inaudible responses--or nonresponses--when Santos-Pena mentioned the United States in connection with defendants' cocaine,

58

contrasted with their patent enthusiasm for the much higher prices that other drugs could be sold for "in the United States," a juror could rationally conclude that if in fact defendants did not actually know their cocaine was to be sent to the United States, they deliberately avoided knowing it.

In sum, given the record, the evidence at trial was ample to permit the jury to find that defendants, if they lacked actual knowledge, deliberately avoided learning--or forming a belief--that their cocaine was to be bound for the United States. We conclude that defendants' challenges to the instruction on conscious avoidance are without merit.

4. *The Defense of Entrapment*

At trial, defendants argued that they were inexperienced and unknowledgeable, were not the large-scale narcotics traffickers that the government painted them to be, and had been entrapped by the government. "It is well settled that the fact that officers or employees of the Government *merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution.*" *Jacobson v. United States*, 503 U.S. 540, 548 (1992) (internal quotation marks omitted) (emphasis ours). Rather,

> a valid entrapment defense has two related elements: government inducement of the crime, and *a lack of predisposition* on the part of the defendant to engage in the criminal conduct. . . . *Predisposition, the principal element in the defense of entrapment, . . . focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime.*

*Mathews v. United States*, 485 U.S. 58, 63 (1988) (internal quotation marks omitted) (emphases ours). When a defendant has presented credible evidence of inducement by a government agent, the government has the burden of proving beyond a reasonable doubt that the defendant was predisposed to commit the crime. *See, e.g., Jacobson*, 503 U.S. at 548-49.

The government may prove predisposition in any of a number of ways, including by presenting evidence of

> (1) an existing course of criminal conduct similar to the crime for which [the defendant] is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement.

*United States v. Salerno*, 66 F.3d 544, 547 (2d Cir. 1995) ("*Salerno*") (internal quotation marks omitted), *cert. denied*, 516 U.S. 1063 (1996); *see, e.g., United States v. Valencia*, 645 F.2d 1158, 1167 (2d Cir. 1980) (evidence that the defendants had a "readily available

source of supply for cocaine" and "were somewhat experienced with cocaine transactions" supported an inference that they had previously been engaged in a similar course of criminal conduct, and thereby established predisposition); *United States v. Cromitie*, 727 F.3d 194, 216 (2d Cir. 2013) (predisposition shown by "willing[ness] to join in a terrorism plot without any hesitation or reservation" (internal quotation marks omitted)).

"The question of entrapment is generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63. When a defendant contends on appeal "that he was entrapped as a matter of law," he is mounting "in substance an attack on the sufficiency of the government's evidence of predisposition." *Salerno*, 66 F.3d at 547; *see, e.g., United States v. Harvey*, 991 F.2d 981, 992 (2d Cir. 1993). And when we consider such a contention on appeal--the jury having found beyond a reasonable doubt that the government established predisposition--we view the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor. *See, e.g., Salerno*, 66 F.3d at 547.

Here, defendants contend that the government failed as a matter of law to establish their predisposition to commit the charged crime of importing cocaine into the United States, arguing that no rational juror could have found either that

their responses at their October meeting with Sentado evinced their ready willingness to commit that crime or that they were generally involved in international drug trafficking prior to that meeting. (*See, e.g.*, Campo brief on appeal at 32-36.) Given the record, we reject these contentions.

As to an existing course of similar conduct, there was ample evidence that defendants had long been involved in drug trafficking, including internationally, well before they had any contact with anyone connected with the United States Government; at their various October meetings in Venezuela, they told the CSes about some of their drug trafficking experiences. For example, at their first meeting with Santos-Pena and Santos-Hernandez on October 23, Campo said that defendants had been doing drug trafficking business with Mexicans. (*See* Tr. 619-20; GX 203-T at 25.) Campo also described a bad incident in which he had accepted a shipment from a recommended narcotics supplier "relying on the fact that it has a certain purity"; "they told me that it was one thing and something different arrived," and "I lost money." (GX 201-T at 4-5.) However, Campo left no doubt that defendants' overall history in the business had been extensive and profitable. At defendants' October 26 meeting with the CSes, Campo said "I'm thirty years old, [U/I] thirty years old. I've been doing this work since I was eighteen"; he said "we have made money.

And ever since we started making money, we've been flashy. . . . [W]e have Ferraris" and a "level of comfort that . . . is not going to go away because of a measly ten million dollar deal." (GX 207-T at 6.)

Campo's boasts that defendants had a sizable ongoing drug trafficking business prior to October 2015 were supported by the texts of August and September 2015 found on the phones seized from defendants when they were arrested. They encompassed hundreds of messages from, to, or between Campo and Flores and other drug traffickers, revealing other discussions of "looking for work," "sell[ing 1000] chairs for the party" at "200 per unit," the availability of "pilot[s]," and hoping "to purchase" a "big" airplane "as soon as we are able." For example:

■ On August 7, Flores wrote to Campo that he had run into an individual called "Pepero" or "Pepe," and that Pepe was "[l]ooking for work." (GX 405-T at 5.)

■ On August 18, Campo contacted Pepe, saying, "My cousin gave me your number." (GX 408-T at 2.)

■ On August 25, Pepe sent Campo an exchange of messages with a person named "Mayweather" and wrote that "he has two with a pilot and co-pilot," and Campo responded "[h]ere we go this is going to work out for us." (GX 408-T at 4-5.)

■ On August 31, when Flores asked Pepe "[w]here do we send the g5" (apparently referring to a Gulfstream V jet (*see* Tr. 204)), Pepe responded: "It's going for *el sombrero*." (GX 515-T at 3 (italics in original).)

■ On September 7, Pepe informed Campo he was "talking with the people they want us to sell them the chairs for the party then they will give us the papers." (GX 408-T at 16.) Pepe told Campo "we can charge them 200 per unit if it's 1000 we will be left with 200 thousand." (*Id*.)

■ On September 16, Pepe sent Flores an exchange of messages in which Mayweather--apparently referring to models of Cessna piston engine aircrafts--had asked Pepe if they could use either a "402" or "404" because "[t]hose are the ones which are available" (GX 515-T at 7); Flores responded that the planes "ha[d] to be bigger" (*id*. at 9).

■ Pepe relayed that message to Mayweather, who responded on September 17 that he was "on the move already" looking for "a big one" "[w]ith turbines." (GX 515-T at 10.) Pepe sent this exchange to Flores, who responded: "Okay let's wait." (*Id*.)

■ On September 20, when Pepe informed Flores that "[t]he other big lift is ready"; Flores responded "[a]wesome," told Pepe "[w]e are waiting to purchase one as soon as we are able to," and sent a picture of a Learjet plane for sale at $128,500. (GX 515-T at 11-12.)

■ However, on September 25, Pepe sent Flores a series of messages with Mayweather in which Mayweather indicated that the "captain" had been unable to obtain the necessary permit. (GX 515-T at 16-17.) Campo promptly texted Pepe that he was frustrated at having been "postponed twice already," which made him look bad (GX 408-T at 18-19), and said he had found "someone else to do it with" (*id*. at 18).

■ In texts on September 28, 2015, between Flores and Pepe, Pepe stated that "*the taco people* will be arriving today." (GX 515-T at 9 (emphasis added).)

■ In the afternoon of October 1, Campo stated that he was "tired of waiting" and told Pepe he was "making arrangements with other people" (GX 408-T at 26)--presumably Flaco.

■ In a text conversation on the night of October 1, 2015, Campo and his associate "Gilson" discussed plans to charter a plane to fly between Venezuela and San Pedro Sula, Honduras, which would cost around $20,000, and the need to have copies of the passengers' passports (GX 407-T at 19-21).

Thus, the thrust of defendants' conversations prior to October 3, 2015, revealed their efforts to obtain money by, *inter alia*, flying cocaine from Venezuela to buyers in other countries: expressly to Honduras, as texted on October 1, and implicitly--given the references to the sombreros and taco people, as the government argued without objection--to Mexico. Campo's frustration over delays by other would-be drug trafficking partners was what led defendants to go to Honduras on October 3 to meet with Sentado as recommended by Flaco--a Honduras-based Colombian drug trafficker who had no connection with the United States government. The jury could easily view defendants' prior attempts to fly cocaine to drug traffickers in other countries as similar to the conduct charged here.

Finally, as to proof of predisposition through a defendant's response of ready willingness to commit the crime charged, there was abundant evidence of enthusiasm on the part of Campo and Flores for this crime. In challenging the sufficiency of the government's evidence of predisposition to have their cocaine introduced into the United States, defendants emphasize that there was no recording

of the October 3 meeting with Sentado --their first meeting with anyone working with the DEA--and thus no direct evidence of what was said at that meeting. But this argument is a non sequitur. If at the October 3 meeting there was no indication that the cocaine offered by defendants would be destined for the United States, then there was no inducement by the government at that time.

And if there was such discussion of the United States at that October 3 meeting, the evidence showed that defendants signed on with alacrity, as on October 4 they told their cohort Pepe that they had found another buyer; and on October 5 they were urging more speed by Sentado and his associates. As chronicled by the district court (referring to Campo as "Campo Flores," and to Flores as "Flores de Freitas"), defendants' immediate responses to whatever was discussed on October 3 included the following:

- ... [O]n October 4, 2015, Flores de Freitas told Pepe that Defendants "already did it [somewhere] else[]." GX 515-T at 26.

- On October 4, 2015, Defendants discussed "security logistics" and purchasing several new BlackBerrys. GX 402-T at 2-3; GX 510-T at 16.

- On October 5, 2015, Flores de Freitas reached out to one of Sentado's associates, Rayo, to complain that "[t]he man has not given the name of the contact to primo." *See* GX 504-T at 2.

- On October 5, 2015, Campo Flores explained to Sentado that "[w]hat I want is to start work because the electoral campaign is almost here and I always contribute . . . [w]ith money if you know what I mean that is why I want to start work." GX 3508-38-T; Tr. 475.

- On October 12, 2015, Flores de Freitas asked Rayo "[w]hat happened to the man he hasn't been in touch with *el primo* for a while and we're ready;" then subsequently explained that "[e]verything is good brother just waiting to receive your visit over here." GX 504-T at 3.

Posttrial Order, 2017 WL 1133430, at *4. In sum, the record showed that "[i]mmediately after their October 3, 2015 meeting with Sentado in Honduras, Defendants were eager to proceed full steam ahead with the scheme." *Id*.

Finally, even if at the October 3 meeting with Sentado there was no mention of selling cocaine in the United States, it is indisputable that distribution in the United States was discussed at the next meetings of Campo and Flores with Sentado's supposed associate Santos-Pena. Defendants first met Santos-Pena on October 23 and met with him again on October 26 and 27. As discussed in Parts I.A.2.a. and II.B.1. above, the recordings of defendants' first meeting with Santos-Pena show that in that October 23 meeting, when Campo complained about being unable to reach Sentado, Santos-Pena said "I am the person who is responsible for taking everything to the United States" (GX 203-T at 6), and nothing indicated that

67

defendants evinced any hesitation or reservation about proceeding. Far from it. The discussions promptly turned to money and methods. Campo said he "need[ed] twenty million dollars" "by December" because "my mom is running for the election" (*id*. at 11); and they discussed the logistics of transporting the cocaine to Honduras (*see id*. at 9-10, 13-14). Campo volunteered that he might be able to provide an airplane; and he indicated that he had done similar business with other Mexicans (*see id*. at 25).

In sum, upon mention that the drugs would be sold in the United States, there was no semblance of any reluctance or hesitation by these defendants, who had spent the previous two months attempting to get partners for their plans to fly cocaine to other countries. Defendants' challenge to the sufficiency of the evidence of predisposition is meritless.

C. *Sentencing*

The presentence report ("PSR") prepared for each defendant calculated a base offense level of 38 based on drug quantity, *see* Guidelines §§ 2D1.1(a)(5) and 2D1.1(c), and recommended several increases for various enhancements or adjustments. The district court, after hearing argument on defendants' objections,

ruled that three two-step increases should be applied, bringing each defendant's total offense level to 44, which was reduced to the Guidelines maximum of 43. For that level, the Guidelines recommend life imprisonment. The government sought a below-Guidelines sentence of 360 months.

The district court concluded that either the Guidelines-recommended life imprisonment or the government-requested 360 months' imprisonment would be "the equivalent of a life sentence" and therefore "too harsh." (Sentencing Transcript ("S.Tr.") at 42-43.) It stated,

> I'm going to impose a sentence of 216 months which will put this case at the offense level of 36, which I think is appropriate, considering all the circumstances, the nature and the circumstances of the offense and the history and characteristics of Mr. Flores De Freitas and Mr. Campo Flores.

(*Id*. at 43.) The court also ordered each defendant to pay a fine of $50,000, plus the mandatory special assessment of $100.

On appeal, defendants challenge two of the offense level increases found appropriate by the district court: (1) a two-step adjustment for defendants' roles in the conspiracy as supervisors or leaders of criminal activity, *see* Guidelines § 3B1.1(c); and (2) a two-step enhancement for use of a private aircraft for importation, *see id*. § 2D1.1(b)(3)(A). We reject both challenges; only the second requires extended

discussion.

1. *The Supervisory Role Adjustments*

The Guidelines recommend a two-step increase in offense level for a defendant convicted of nonextensive criminal activity in which he was an organizer, leader, manager, or supervisor of at least one other participant, but of fewer than four other participants. *See* Guidelines § 3B1.1(c); *id*. Application Note 2; *see, e.g., Garcia*, 413 F.3d at 223. A "participant" for purposes of § 3B1.1 is "a person who is criminally responsible for the commission of the offense, but [who] need not have been convicted." Guidelines § 3B1.1 Application Note 1; *see, e.g., United States v. Ware*, 577 F.3d 442, 453 (2d Cir. 2009). In imposing such a role adjustment, the court is required to make findings that are sufficiently specific to permit meaningful appellate review. *See, e.g., United States v. Skys*, 637 F.3d 146, 156-57 (2d Cir. 2011) ("*Skys*"). When the court meets this standard, its findings of fact will be overturned only if they are clearly erroneous. *See, e.g., United States v. Napoli*, 179 F.3d 1, 14-15 (2d Cir. 1999); *see generally United States v. Persico*, 164 F.3d 796, 804 (2d Cir. 1999).

Defendants, principally citing *Skys*, contend that the district court erred in applying role increases to them because it did not sufficiently identify any other

person who was criminally responsible for the conspiracy and who was supervised or led by either defendant. (*See* Flores brief on appeal at 54-58.) We disagree.

*Skys* was a case in which the district court found the defendant to have organized an "extensive" fraudulent operation in which the court found he "had" one named individual about whose knowledge of the fraud there was little evidence, and "had the *unwitting* participation of other people at . . . financial institutions." 637 F.3d at 156 (emphasis added). We concluded that these findings were insufficient to permit meaningful appellate review and required a remand for clarification or further proceedings.

In the present case, in contrast, the district court found, after considerable discussion, that Campo and Flores "were organizers and leaders" of the conspiracy and that "[t]he participants that they led and organized were Pepe, Gocho, Daza at least, and [Carlos] Gonzalez, as well, plus the one bodyguard Modino [*sic*] Moreno who was there with Mr. Flores De Freitas in [Honduras] on the 6th of November of 2015." (Hearing Transcript, October 3, 2017, at 56-57; *see* Flores brief on appeal at 55 n.12 ("'*Modino* Moreno' is not an individual who appears anywhere in the record, though the District Court was likely referring to Jesfran Josnel Moreno, one of Flores's bodyguards" (emphasis ours)).)

71

The court's statement was sufficient, in light of the trial record, to name at least one criminally culpable person directed by Flores and one by Campo, and to permit meaningful appellate review. The court found that Flores brought Moreno to the November 6 meeting, which is described in Part I.A.2.c. above. Moreno served as Flores's bodyguard at that meeting, at which Flores was advised about the most suitable days and times to have a drug shipment arrive at the Honduras airport, and at which Flores told Gomez that defendants would have a plane arrive with their first shipment of cocaine late in the afternoon on November 15. With respect to Campo, although the district court's findings did not elaborate on the actions and functions of Pepe, Gocho, Daza, or Carlos Gonzalez, the trial record contained ample evidence of the participation of at least Pepe, Gocho, and Daza in the drug trafficking conspiracy. As to Daza in particular (who, as noted in Part I.A.1. above, was called "Flacco"), there was evidence that it was he who had introduced Campo and Flores, in their quest for cocaine distributors, to Sentado (*see id*.); and at defendants' October 26 meeting with the CSes, Campo referred to Daza as "my guy" (GX 208-T at 29), as his "very responsible" and "super loyal" guy in Honduras (GX 207-T at 18), who, for his role, would be paid by Campo (*see* GX 205-T at 50-51).

In light of the record, we see no error in the district court's findings that

72

Flores and Campo each supervised or directed at least one other criminally culpable person.

## 2. *The Enhancement for Private Aircraft*

Guidelines § 2D1.1's subsection (b), "Specific Offense Characteristics" ("SOCs"), provides that a defendant's offense level is to be increased by two steps

> *[i]f the defendant unlawfully imported* or exported *a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import* or export *the controlled substance*, (B) a submersible vessel or semi-submersible vessel as described in 18 U.S.C. § 2285 was used, or (C) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance.

Guidelines § 2D1.1(b)(3) (emphases added). The district court applied part (A) of this SOC to Campo and Flores based on their plan to have the 800 kilograms of cocaine flown from Venezuela to Honduras on an airplane coming from the "'president's hangar'" (Tr. 1159 (quoting GX 222-T at 18)).

Defendants contend that, given part (A)'s phrase "was used," employing the past tense, and given that the present prosecution resulted from a sting operation, and the conspiracy did not result in any actual importation of cocaine into the United

73

States or the actual use of an aircraft to carry cocaine, the district court's application of § 2D1.1(b)(3)(A) to them was error. (*See* Flores brief on appeal at 52-54.) In support of this contention, defendants rely on decisions of the Ninth and Eleventh Circuits in *United States v. Joelson*, 7 F.3d 174, 180 (9th Cir.) ("*Joelson*"), *cert. denied*, 510 U.S. 1019 (1993), and *United States v. Chastain*, 198 F.3d 1338, 1353 (11th Cir. 1999) ("*Chastain*"), *cert. denied*, 532 U.S. 996 (2001).

Reviewing the district court's interpretation of the Guidelines *de novo*, *see*, *e.g.*, *United States v. Valente*, 915 F.3d 916, 921 (2d Cir. 2019), we are not persuaded to follow the decisions of *Joelson* and *Chastain* for the reasons we explain below. We begin with observations as to the penalties prescribed by 21 U.S.C. § 963 for drug conspiracies and the evolution of Guidelines §§ 2D1.1 and 2D1.1(b)(3)(A).

a. *Statutory Penalties Prescribed for Conspiracy Offenses*

Most federal criminal statutes prohibit completed substantive offenses; conspiracies to violate such sections are generally prohibited by the umbrella provisions of 18 U.S.C. § 371 (imposing a penalty of, *inter alia*, up to five years' imprisonment if "two or more persons conspire either to commit any [felony] offense against the United States, or to defraud the United States, or any agency thereof in

74

any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy").

A few criminal statutes, such as the Hobbs Act and certain provisions of the Violent Crime Control and Law Enforcement Act of 1994 ("VCCLEA") and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), prohibit conspiracies in the same section that prohibits the substantive crimes that are the objects of the conspiracy. *See*, *e.g.*, Hobbs Act, 18 U.S.C. § 1951 (authorizing a penalty of, *inter alia*, up to 25 years' imprisonment for a person who "in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion or attempts *or conspires so to do*" (emphasis added)); VCCLEA, 18 U.S.C. § 2332a (authorizing, *inter alia*, "imprison[ment] for any term of years or for life" for "[a] person who, without lawful authority, *uses*, threatens, or attempts *or conspires to use*, a weapon of mass destruction" against certain persons or facilities (emphases added)); AEDPA, 18 U.S.C. § 2339B (authorizing, *inter alia*, up to 20 years' imprisonment for a person who "knowingly *provides material support or resources to a foreign terrorist organization*, or attempts *or conspires to do so*" (emphases added)). For these types of offenses, the penalties authorized for conspiracy to commit the substantive offense are not found in § 371. Rather the section that expressly prohibits substantive offenses and

conspiracy to commit those offenses also specifies the applicable penalties--but without an indication as to Congress's view of the two categories' comparative seriousness.

The Controlled Substances Act--comprising a subchapter called "Control and Enforcement," 21 U.S.C. §§ 801-904, and a subchapter called "Import and Export," *id*. at §§ 951-971--is different. It contains two provisions that deal solely with attempts and conspiracies, *i.e.*, 21 U.S.C. §§ 846 and 963. In contrast to the above provisions of Title 18, these two sections provide that

> [a]ny person who attempts or *conspires* to commit any offense defined in this subchapter *shall be subject to the same penalties as those prescribed for the offense*, the commission of which was the *object of the* attempt or *conspiracy*.

21 U.S.C. §§ 846, 963 (emphases added).

b. *Guidelines § 2D1.1 and Prior § 2D1.4*

When the Guidelines were first promulgated in 1987, § 2D1.1 was titled "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)." At that time (and until 1992), § 2D1.1 was not expressly applicable to conspiracies. Instead, the Guidelines included a separate

76

section, § 2D1.4, captioned "Attempts and Conspiracies," which provided as follows:

> Base Offense Level: If a defendant is convicted of participating in an incomplete conspiracy or an attempt to commit any offense involving a controlled substance, *the offense level shall be the same as if the object of the conspiracy* or attempt *had been completed*.

Guidelines § 2D1.4 (1987) (emphases added). This initiated application of the provisions of 21 U.S.C. §§ 846 and 963--that the penalties for drug conspiracy be the same as for the drug offense that was the object of the conspiracy--by providing that the defendant's base offense level would be the same for either.

Although no specific offense characteristics were specified in § 2D1.4, we think the Guidelines implicitly intended that the SOCs to be used in calculating the offense level of a person convicted of a given substantive drug trafficking offense should also be applied to one convicted of conspiracy to commit that offense. As the Guidelines themselves note, among Congress's goals in enacting the Sentencing Reform Act of 1984, *see* 28 U.S.C. §§ 991-998; 18 U.S.C. §§ 3551-3586--and calling for the creation of guidelines--were the achievement of "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity," as well as "uniformity" by reducing the "disparity in sentences imposed" for similar defendants "*for similar criminal conduct*." Guidelines Chapter 1,

Part A, at 1.2 (1987) (emphasis added). Accordingly, given that Congress in §§ 846 and 963 expressly provided that a person convicted of conspiracy to commit a substantive drug trafficking offense be subject to the same penalties as if he had committed that substantive offense, we infer that the Guidelines, in providing offense level enhancements for specific characteristics of drug offenses, were not intended to assign the conspirator and the substantive offender offense levels that differed.

In sum, we infer that when the Guidelines included § 2D1.4, they implicitly required that the offense level of a person convicted of conspiring to commit a drug trafficking offense be calculated with reference to § 2D1.1(b) specific offense characteristics that would have affected his offense level if he had been convicted of that substantive offense.

c. *Section 2D1.1 and "Specific Offense Characteristics"*

The specific offense characteristic set out in § 2D1.1(b)(3) has been so-numbered since 2010. *See* Guidelines Appendix C, Vol. III, Amendment 748, at 374 (eff. Nov. 1, 2010). It has existed in its present form, with three subparts, since 2009. *See* Guidelines Appendix C, Vol. III, Amendment 728, at 314 (eff. Nov. 1, 2009) (inserting part (B) after part (A), and redesignating the previous part (B) as (C)).

Prior to 1989, § 2D1.1's subsection (b) set out only one specific offense characteristic; it prescribed a two-step increase in offense level if a dangerous weapon such as a firearm "was possessed," Guidelines § 2D1.1(b)(1) (1988). In 1989, the subsection was amended to add a second SOC, *see* Guidelines Appendix C, Vol. I, Amendment 134, at 72 (eff. Nov. 1, 1989), the precursor of the current § 2D1.1(b)(3). It provided for at least a two-step increase in offense level

> [i]f the defendant is convicted of violating 21 U.S.C. § 960(a) under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import the controlled substance, or (B) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance.

Guidelines § 2D1.1(b)(2) (1989); *see also id*. (providing that if the result of this increase brought the defendant's offense level to less than 26, his offense level should be raised to 26).

In 1992, Guidelines Amendment No. 446 amended then- § 2D1.1(b)(2), to the extent pertinent here, by adding a reference to exportation, and by deleting the reference to a conviction under § 960(a) and referring instead to a defendant who "unlawfully imported or exported a controlled substance." Guidelines Appendix C, Vol. I, Amendment 446, at 320 (eff. Nov. 1, 1992). Thus, the then-§ 2D1.1(b)(2)

79

provided for the at-least-two-step increase

> [i]f *the defendant unlawfully imported or exported* a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, or (B) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance.

Guidelines § 2D1.1(b)(2) (1992) (emphasis added).

At the same time, the Guidelines were amended to delete § 2D1.4 which had expressly covered Attempts and Conspiracies, and to make § 2D1.1--and 17 other individual drug offense guidelines--expressly applicable to attempts and conspiracies. *See* Guidelines Appendix C, Vol. I, Amendment 447, at 322-24 (eff. Nov. 1, 1992) ("Amendment 447"). To accomplish the latter, Amendment 447 listed each of the 18 guidelines and stated that all "are amended in their titles by inserting at the end thereof in each instance '; Attempt or Conspiracy'." *Id*. at 322. Accordingly, the title of Guideline 2D1.1 was amended, effective November 1, 1992, to read "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy." As an explanation, Amendment 447 stated only as follows:

> **Reason for Amendment:** *This amendment clarifies and simplifies the*

*guideline provisions dealing with attempts and conspiracies in drug cases* and conforms the *structure* of these provisions to that of other offense guidelines that specifically address attempts and conspiracies (*i.e.*, offense guidelines referenced by §2X1.1(c)).

Amendment 447, at 324 (emphases added). This statement does not suggest that any substantive change in Guidelines treatment of drug offenses was intended.

Section 2D1.1 thus became one of the guidelines that, following Amendment 447, is listed in § 2X1.1 as an "Offense guideline[] that expressly cover[s] conspiracies," Guidelines § 2X1.1 Application Note 1. Section 2X1.1 instructs that "[w]hen an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, *apply that guideline section*." Guidelines § 2X1.1(c) (emphasis added). As a fundamental matter of interpretation, the Guidelines instruct that when one guideline gives "an instruction *to apply* another offense guideline[]," that instruction "refers to the *entire* offense guideline (*i.e.*, the base offense level, *specific offense characteristics*, cross references, and special instructions)." Guidelines § 1B1.5(a) (emphases added).

Thus, Amendment 447 clarified and made explicit what we view as having been previously implicit. The title of § 2D1.1 was amended to show that that guideline expressly covers drug conspiracies; § 2X1.1 thus identifies § 2D1.1 as a

guideline that does so; § 2X1.1(c) therefore instructs courts "to apply" § 2D1.1 to a defendant convicted of a drug conspiracy; and under § 1B1.5(a), that instruction means that the court is to apply to convicted drug trafficking conspirators the entire § 2D1.1 guideline, including its stated specific offense characteristics. Accordingly, we conclude that the district court properly applied the SOC enhancement in § 2D1.1(b)(3)(A) to Campo and Flores.

d. *The Decisions in* Joelson *and* Chastain

The decisions in *Joelson* and *Chastain* do not persuade us to reach a contrary conclusion. In *Joelson*, the defendant was convicted of having, *inter alia*, conspired in 1990 to import approximately 770 kilograms of cocaine, and having aided and abetted the importation of that cocaine, in violation of 21 U.S.C. §§ 963, 952, and 960.

> [T]he cocaine was delivered to a landing strip in Guatemala in an Arrow Commander one thousand, which was not a "regularly scheduled commercial air carrier." The cocaine was unloaded, and DEA agents took the cocaine, stored it, and ultimately flew it into the United States on a commercial Pan Am flight.

*Joelson*, 7 F.3d at 179-80. The district court's calculation of Joelson's sentence included a two-step increase in offense level pursuant to the private aircraft enhancement in

82

then-§ 2D1.1(b)(2)(A).

Joelson argued that that increase was error based on the past-tense meaning of "was used" in then-§ 2D1.1(b)(2)(A). The Ninth Circuit agreed and remanded for resentencing without the two-step increase:

> Joelson argues, and we agree, that the *plain language* of section 2D1.1(b)(2) should be given effect. The cocaine was imported from the landing strip in Guatemala to the United States. Although *a private plane flew the cocaine to Guatemala, a commercial Pan Am air carrier "**was used** to import" the cocaine into the United States. See* U.S.S.G. § 2D1.1(b)(2). *Stretching the definition of "used to import" to incorporate any use of a private airplane, regardless of whether it was used during the actual importation of the cocaine, flies in the face of the "plain language" of section 2D1.1(b)(2). . . .* Moreover, nothing in the commentary to section 2D1.1(b)(2) compels a contrary conclusion. . . .

> The government also argues that a two-level increase in the offense level under section 2D1.1(b)(2) was proper because the coconspirators *intended* to use a private airplane to import the cocaine. We disagree. Section 2D1.1(b)(2) provides for a two-level increase only if an aircraft other than a regularly scheduled commercial air carrier *was used* to import the cocaine. It does not provide for an increase when the parties merely intended to use a private airplane.

*Joelson*, 7 F.3d at 180 (emphases ours).

We question this reliance on the SOC's use of the past tense. The defendant in *Joelson* was sentenced in 1991, at a time when, as indicated in Part

83

II.C.2.c. above, Guidelines § 2D1.1 applied to convictions for "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)" but did not cover conspiracies expressly. Given that until late 1992 § 2D1.1 was only expressly applicable to completed offenses, it is not surprising that its SOCs were described in language that used the past tense. Our analysis in Parts II.C.2.a.-c. above, leading to the conclusion that the guidelines applicable to a conviction under § 963 previously implicitly required--and now explicitly require--application of the § 2D1.1(b) private aircraft enhancement to drug trafficking conspirators as well as to those convicted of the substantive drug offense that was the object of the conspiracy, is not refuted by the simple fact that part of a guideline which was promulgated when the guideline only expressly covered completed offenses was phrased in the past tense.

In *Chastain*, the defendants had been involved in several months of mishaps, discussions, and negotiations in 1996 with a view to obtaining an airplane in order to bring a large quantity of marijuana from Jamaica to the United States. *See* 198 F.3d at 1344-47. They were arrested before any flight was made to Jamaica to pick up the drugs and were convicted of attempting and conspiring to import marijuana into the United States in violation of 21 U.S.C. §§ 963 and 952(a). The district court's

calculation of the appellants' sentences included a two-step increase in offense level pursuant to then-§ 2D1.1(b)(2)(A) for use of a private aircraft. The appellants contended that that increase was error, and the Eleventh Circuit--relying in part on *Joelson*--agreed:

Appellants . . . challenge the district court's application of a two-level upward adjustment for *their plan to use* a private plane to import narcotics, pursuant to U.S.S.G. § 2D1.1(b)(2). § 2D1.1(b)(2) states, *inter alia*, that "If the defendant unlawfully imported or exported a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier *was used* to import or export the controlled substance, ... increase by two levels."

Appellants argue that the enhancement was inappropriate because no *actual* importation or "use" occurred on these facts. *The district court below, in applying the enhancement, endorsed a broad interpretation of the plain language of the guidelines, relying on the terms "Attempt or Conspiracy" found in the title of § 2D1.1.*

The Ninth Circuit, previously confronted with interpreting § 2D1.1(b)(2), held that the *intent to use a private plane was not enough to warrant the two-level enhancement. See United States v. Joelson*, 7 F.3d 174, 180 (9th Cir. 1993) (*cert. denied*, 510 U.S. 1019, 114 S.Ct. 620, 126 L.Ed.2d 584). In Appellants' case, there was clearly an attempt and a conspiracy, on which the district court relied in applying this enhancement. However, *the plain language of the guideline that uses the past tense, viz "used to import," cannot be ignored. When the language of the guideline is clear, it is not necessary to look elsewhere for interpretation.* Here, the language of the guideline clearly contemplates a completed event, an actual importation. That did not occur in this case. *The Court will not look*

*to the title of a guideline to explain what is quite clear in its text*.

> Thus, the district court's reliance on the terms in the title as explanatory of the guideline is misplaced. The two-level increase as applied to these three Appellants, therefore, was an error of law.

*Chastain*, 198 F.3d at 1353 (emphases ours).

The events at issue in *Chastain* occurred in 1996; by that time, § 2D1.1 of the Guidelines had been made expressly applicable to attempts and conspiracies. Thus, we disagree with the decision in *Chastain* for two reasons. First, as discussed above with respect to *Joelson*, the past-tense phrasing on which that decision and the *Chastain* decision relied was adopted at a time when attempts and conspiracies were not expressly covered by 2D1.1. Use of the past tense with respect to completed crimes strikes us not as prescriptive but descriptive.

Second, we think the *Chastain* Court, in finding that the district court erred in relying on the fact that the title of § 2D1.1 by then included attempts and conspiracies, gave insufficient deference to the manner in which the Guidelines drafters chose to indicate in 1992 that § 2D1.1 was amended to cover attempts and conspiracies expressly. In dealing with statutes, and attempting to fathom what Congress intended, we look to the "factors that typically help courts determine a

statute's objectives and thereby illuminate its text," to wit, "the statute's language, structure, subject matter, context, *and history*," *Almendarez-Torres v. United States*, 523 U.S. 224, 228 (1998) (emphasis added); and "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute," *id*. at 234 (internal quotation marks omitted).  Though the Guidelines do not have the force of law, the title of a specific guideline must be viewed as a tool for interpreting the scope of that guideline, especially when, as in Amendment 447, the Sentencing Commission has expressly chosen expansion of the title as the means of "clarif[ying]" the guideline's express scope.

We note also that it is hardly clear that the Eleventh Circuit itself continues to follow the holding or reasoning of *Chastain*, as that court has held § 2D1.1(b)(2) applicable to a defendant convicted of conspiracy despite its use of the past tense, either in part (B) or indeed in that SOC's introductory clause--"[i]f the defendant unlawfully import*ed*" (emphasis added)--which applies to all of its parts. In *United States v. Rendon*, 354 F.3d 1320, 1329-30 (11th Cir. 2003) ("*Rendon*"), the court upheld an offense level enhancement under then-part (B) for a defendant convicted under § 963, who had "*acted* as a . . . captain, . . . aboard a[] craft or vessel *carrying*" cocaine, Guidelines § 2D1.1(b)(2)(B) (2002) (emphases added), despite the fact that the

87

cocaine had been jettisoned en route and never reached the United States. Rejecting the defendant's argument that imposition of the increase was error because the enhancement's all-encompassing "introductory phrase . . . 'if the defendant unlawfully imported or exported a controlled substance,' . . . is in the past tense," 354 F.3d at 1330 (quoting then-§ 2D1.1(b)(2)), the *Rendon* court noted that "the general heading of § 2D1.1 provides that the adjustments in § 2D1.1 apply to not only substantive drug offenses, but also to attempt and conspiracy offenses"; the court adopted the reasoning of the First Circuit that an argument based on the enhancement's use of the past tense was "'frivolous,'" 354 F.3d at 1330 (*quoting United States v. Rodriguez*, 215 F.3d 110, 124 (1st Cir. 2000) ("*Rodriguez*"), *cert. denied*, 532 U.S. 996 (2001)):

> "*The adjustment in § 2D1.1(b)(2)(B) plainly is to be applied to convictions for conspiracy and attempt, so long as the necessary factual predicate for the enhancement exists. . . .* [The defendant's] argument is simply that the substantive crime was not committed. *It simply does not matter whether he actually carried the controlled substance; his conspiring and his attempt to do so warrant the application of the enhancement.*"

*Rendon*, 354 F.3d at 1330 (quoting *Rodriguez*, 215 F.3d at 124 (emphases ours)).

In sum, 21 U.S.C. § 963 provides that a defendant who has conspired to violate §§ 959 or 960 is to be subject to the same penalties as those prescribed for one

who has violated those sections. We conclude for the reasons discussed above that § 2D1.1 of the Guidelines expressly covers both substantive drug trafficking offenses and drug trafficking conspiracies. Guidelines § 2X1.1 thus instructs courts "to apply" § 2D1.1 to drug conspiracy convictions; and that instruction means that the court is to apply the "entire" § 2D1.1 guideline, "including" its "specific offense characteristics," Guidelines § 1B1.5(a). Accordingly, the district court did not err in applying the SOC enhancement in § 2D1.1(b)(3)(A) to calculate the offense levels of Campo and Flores.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found in them no basis for reversal. The judgments are affirmed.